Case No. 17-1834 Nicholas Maslonka v. Bonita Hoffner Oral Argument not to exceed 15 minutes per side Mr. Shimkus for the appellant Good morning, your honors. Assisting Attorney General Scott Shimkus appearing on behalf of Respondent Appellant Warden Bonita Hoffner I would like to reserve two minutes for rebuttal. The Supreme Court has recognized that it is all too tempting for a defendant to second-guess counsel's assistance after a conviction or adverse sentence. Petitioner Nicholas Maslonka has unfortunately given into that temptation in this case where his counsel did not have a duty to represent him in his federal cooperation and he has only himself to blame for failing to cooperate with the federal authorities thereby losing out on the more favorable state plea agreement. But the district court disagreed granting Mr. Maslonka habeas relief on his ineffective assistance of counsel claims under both United States v. Cronick and Strickland v. Washington. But under either AEDPA or De Novo review the district court erred for three specific reasons. First, under Cronick, Mr. Maslonka's cooperation with the federal authorities was not a critical stage of his state armed robbery prosecution and therefore as Mr. Maslonka concedes he was not entitled to counsel for that cooperation. And second, under Strickland for the performance prong for the actual critical stages of Mr. Maslonka's state prosecution Mr. Maslonka's counsel was present and representing him competently. And finally, for the prejudice prong of Strickland Mr. Maslonka did not suffer any prejudice because it was he, not his counsel who was the reason that he lost out on the more favorable state plea agreement. I don't read there claim number one or how you just described these three reasons the same way that you phrase it. It's tempting if it's you, if it's your side to say that he wasn't entitled to have counsel over on the federal side in connection with the state proceeding. That seems to be probably true. But that isn't what the claim is. The claim is that in connection with his performance of the cooperation agreement on the state side he wasn't competently represented. She didn't go with him. She didn't get the terms defined. She didn't help him accomplish, I guess is the bottom line the favorable plea deal. Correct, Your Honor. That is how their claim is framed. So what's the matter with framing it that way? There's nothing wrong with framing it that way, Your Honor. That certainly is the way they have framed it. But our contention is even under that framework Mr. Muslanka was not entitled to have his state appointed counsel do those things with respect to his federal cooperation because those were separate. They were separate proceedings. But isn't it the case that the outcome of his state I mean all of this time when she allegedly was not actually competently representing him all of that preceded, did it not, the actual entry of the plea? In the state prosecution, yes. In the state prosecution, right, which is the only thing we're really worried about here. Correct. So up until your right to counsel I would have thought persists through your conviction and sentencing. I guess I misunderstand your point, Your Honor. Well, two things. One, you said that he concedes that she didn't have any right to counsel during this process. And I didn't understand that there was that concession. So I might need to have you point out to me where that concession is. Absolutely, Your Honor. That appears on page 40 of their brief. They say that they have never contended or that they have long conceded that Mr. Muslanka was not entitled to have representation with respect to his federal cooperation. I believe they mean, though, that he was still entitled to have his state appointed counsel attend those meetings and Here's my problem. If his conviction and plea hung in the balance depending on how well he cooperated, it would seem like there might be a pretty strong claim that he was entitled to have competent assistance through that proceeding even though it was a federal cooperation. It's possible that he could have benefited from having counsel there. There's not much denying that. But if he wanted to have counsel for those proceedings, he needed to request one from the federal level. He needed a federal defender. Something along those lines. It was not his state appointment. I don't understand why. I mean, I really don't understand why. If counsel is appointed in the state proceedings to represent you until you are through the process of conviction and sentencing, and what you're actually convicted of and the ultimate sentence are in part contingent upon something else that happens, albeit it's with the federal system, why aren't you entitled to have help with that something else right up until the point that you actually have been convicted and sentenced? Well, again, Your Honor, he might have been entitled through the federal system, but the problem is the crossover here. The problem is the crossover from the state prosecution into the federal cooperation. They certainly were factually tied. That is present in the record absolutely. The state prosecutor factually tied the federal cooperation to the state prosecution. The problem is the legal connection between counsel's duty to represent Mr. Muslanka in his state prosecution versus her duty to represent, if she had any duty to represent him or even help him in his federal cooperation. For example, Your Honors, I put in my brief the example of if Mr. Muslanka was being prosecuted for domestic violence and one of the conditions of his plea was that he divorce his wife. Who would be the victim in that case? If that were the case, Mr. Muslanka's state appointed criminal attorney wouldn't have any duty and wouldn't be constitutionally ineffective for failing to represent him in those divorce proceedings. This situation might seem more closely tied because we're talking about cooperation and cooperation often comes up in criminal prosecutions and criminal investigations, so they seem more intimately tied. But if we look at a similar example, the difference becomes more obvious. Even if we use your example, which may not be a perfect analogy, while in your hypothetical, the lawyer might not have the duty to go out and actually represent him in the divorce, he or she would have a duty, would they not, to make sure that his client understood that that was the terms of the state cooperation. He needed to get divorced. He needs to get a lawyer. He needs to go through with it. He can't pull back and say, well, I don't want to be divorced at the last minute or it's going to adversely impact the representation for which the lawyer did owe a duty. That's absolutely correct, Your Honor. Isn't that really what the petitioner is saying in this case? That's what he's saying, but that's not what happened. Ms. Irwin didn't have a duty to represent him and advise him with respect to his cooperation proceedings with respect to the state prosecution. But she also advised him regarding the federal cooperation. She said time and time again at the evidentiary hearing here, she testified that she told him that he held the keys to his cooperation. It was up to him to cooperate with the federal authorities and that it rose or fell on his shoulders. Let's assume for a second that there was a clear understanding as to what his cooperation on the federal side had to entail. I'm not sure that's true from reading this, but let's assume that that's true. And that the federal government at the last minute then tries to get him to do a lot of things that he hadn't agreed to do as a part of the state cooperation. Would the lawyer not have a duty to at least try to intercede on his behalf to enforce what the terms of the cooperation agreement were, if in fact the government was reneging on the cooperation agreement? The problem there, Your Honor, is we're talking about two different governments. So the state prosecution is obviously what's at issue here. We're talking there with respect to the grand jury testimony, for instance. That's on the federal level. That's up to the assistant U.S. attorney. That's up to the federal agents. Ms. Irwin did not have any duty to go there and represent or even advise Mr. Muslanka during that time. When he's speaking with the federal authorities, he's speaking with the assistant U.S. attorney. And furthermore, Your Honor, Mr. Muslanka's the only one, the only person at that federal evidentiary hearing who claimed that the federal agents and that the assistant U.S. attorney tried to change the terms of the deal at the last moment. Two federal agents and a first assistant U.S. attorney testified that that's not what happened. So there was a factual dispute there. Counsel, is your stronger defense that prejudice pronged Strickland? I don't know if I would say it's stronger than the crime claim or even the deficient performance prong of Strickland, but it's certainly at least equally as strong as both of those claims because... I think it's stronger. I mean, I think maybe it's somewhat close, whether there's deficient performance here, but I think the prejudice argument is much harder for petitioner to overcome here. So could you talk about the prejudice? Absolutely. We certainly would agree that it's difficult, if not impossible, for Mr. Mislanka to meet the prejudice prong here because it wasn't anything his counsel did or didn't do or could have or couldn't have done to change the outcome here. The state prosecutor testified at the evidentiary hearing and put on the record during the state proceeding as well that nothing Ms. Irwin could have done, could have told him, could have talked to him about, would have changed his mind about the deal. He went back to the original deal that he was thinking about offering Mr. Mislanka even before he knew Mr. Mislanka was cooperating with the federal authorities. Mr. Mislanka was going to be required before Mr. Fox even stepped into the courtroom to talk to Mr. Mislanka, plead guilty to armed robbery, and I will reduce the habitual offender notice from fourth to third. Then he found out Mr. Mislanka was cooperating with the federal authorities and said, okay, if you complete that cooperation to the federal authorities' satisfaction... That was within their discretion, whether it satisfied the U.S. attorney or not? Correct. I imagine your honors are more familiar with it even... That's the way it normally works, I think. Yes. I mean, that was conveyed by counsel to the petitioner and she advised him to cooperate and then he ends up not doing it. Correct. That's why I've been saying, your honor, that this is really, unfortunately, I guess for Mr. Mislanka, it's on him that this fell through. He's the one who refused to continue cooperating. Nothing Ms. Irwin did or didn't do was the reason that he lost out on that more favorable plea agreement. It was on his shoulders,  as she testified at the evidentiary hearing, that she kept using the phrase, he held the keys to getting this deal. And, unfortunately, it didn't... If she were there when he's being interviewed by these DEA agents, I don't know what else she would say. And I really meant what I said before. You have to cooperate. You have to give them the information they want. I'm not sure if she had actually shown up with him, what else she could have said other than what she'd already said. Correct. Yes. He had the information that the federal authorities wanted. All Ms. Irwin could have done was tell him, you need to cooperate with them. She'd already told him that, so she would just reemphasize it, I guess. I think that's absolutely correct, Your Honor. I see that my time is almost up. We ask that you reverse. Thank you. Thank you, Counsel. Good morning, Your Honors. May it please the Court, Jessica LaFleur of the Federal Defender Office in Detroit, representing Respondent Nicholas Meslanka. This Court's characterization of the importance of Mr. Meslanka's cooperation on his state plea agreement is apt. As everybody testified at the evidentiary hearing, Mr. Meslanka's plea offer hinged on his ability to cooperate with the separate federal investigation. And while the government has consistently claimed that that separate investigation is a collateral matter for which he was not entitled to counsel, every court that has ever even considered this issue has accepted the idea that cooperation isn't a collateral matter, but if it's being dealt with in the pretrial negotiation phase, it is part of the plea agreement or the plea offer on the table. The only question in all of those cases had been when, at what point, does that agreement become non-adversarial in terms of some protection, something, some action that counsel engages in that ensures that everybody is in agreement and understanding of what the terms of that cooperation is, what the obligations are, and frankly, any potential limitations that the defendant might have in cooperating. And that agreement needs to be, you know, conveyed to everybody. And frankly, it's interesting in this case that the agent, the case agent on the case, assumed that such a meeting had occurred here because that's his standard practice. And the assistant U.S. attorney that had been dealing with the cooperation who had not been at the initiation of the cooperation also assumed that some meeting had to have occurred. What's your best evidence that you're, that Mr. Maslanka didn't understand that he had to fully cooperate? It's not that he didn't understand he had to fully cooperate, but the question was whether, who he had to cooperate against. So as the district court found... Whoa, whoa, whoa. So this all depends on the definition of fully? This all hinges on the definition of what the scope of the investigation is that he was asked to cooperate involving. The district court made factual findings based on credibility determinations and those factual findings were never clearly challenged by the appellant in their brief that Mr. Maslanka had agreed to cooperate against three individuals in regards to a DEA drug investigation and that he cooperated against those individuals in multiple debriefings. Did he not also agree that he would testify before the grand jury? He did and he at no point in, the district court's factual findings were never that he didn't agree and continued to offer to testify before the grand jury. The district court found that when they sat down, they prepped for the grand jury and everybody was in acceptance of what he was doing then and then when they sat down in the waiting room before the grand jury, the DEA agent started asking Mr. Maslanka about other individuals, people he had not believed he was going to have to cooperate against, people that were closer to him in terms of friends and family that he was concerned about cooperating against and he got nervous and he didn't want to answer questions about them and it was at that point that the DEA agents decided they were not going to call him into the grand jury. He never said he wouldn't testify in the grand jury. He never said he wouldn't testify involving the questions that he had been asked in the grand jury. The district court made the factual finding based on a credibility determination and it's been unchallenged in appellant's brief that Mr. Maslanka's ability to testify before the grand jury terminated when the DEA agents unilaterally made a decision that they didn't want him to testify because he wouldn't answer questions about these other individuals. And had his counsel been there, Judge Griffin, I recognize your point, but had his counsel been there, had she been at the preparatory session, had she been anywhere along the line, anywhere along the line, this could have been assuaged because it could have been avoided. This could have been avoided because they could have made sure that the terms were set out at the beginning that you have to cooperate against anybody and everybody, whether it's the first three people we talk about, whether it's anybody else we introduce you to down the line, you have to cooperate against all of them. I thought it was just kind of open-ended that you have to cooperate in regard to this other investigation and usually it's within the satisfaction of the U.S. attorney within his or her discretion. I mean, you're saying that they limited it up front or something? I'm saying that those are the findings that the district court made. The district court made factual findings that Mr. Misalonga understood his subjective understanding because when he began cooperating, he didn't have a meeting at the beginning with his counsel and the... Where did that subjective understanding come from that he only had to testify against a few people? Because at no point was there anything set down that his subjective understanding was unreasonable because he didn't actually have a sit-down meeting with his counsel and these... They never made a representation to him that your cooperation is limited to the only three people or something? Right, but they never made a representation... They assumed it was? Is that what you're saying? Because they never made a representation to him otherwise because... Well, okay, no. They're saying you have to cooperate fully to our satisfaction. I would think that the presumption is to all individuals involved in this other criminal enterprise and not just to selective people. I mean, I think it would go the other way. Well, there's actually no representation on this record that they ever apprised him of anything in regards to what they believed. Did they have to? I mean, they don't have to... This offer didn't have to be made to him at all. No, it didn't, but it is important, and both the assistant U.S. attorney on the case at the time and Agent Lemesh both discussed why it was important to make sure that everybody was on the same page, why it was important to have meetings with attorneys, with clients, because it is important to them to make sure everybody is on the same page as to what your obligations are. And assistant U.S. attorney Lemesh even talked about the fact that there are times when somebody will come to us and want to cooperate, but they're concerned about cooperating against family members, or they're concerned about testifying, and we will make those limitations. But when you don't have an understanding among the parties as to what cooperation means, what it entails, and what the potential subjective limitations or objective limitations might be of cooperation, it's not like Mr. Mislanka, a criminal defendant, comes in and just innately understands what cooperation means. It's an amorphous term. If you come in... Your whole case, at least your argument so far, seems to hinge on your contention that Judge Tarnow made a finding that the cooperation was limited to three individuals. And I don't see that finding. It does say on page 2 of his opinion that your client provided the DEA with three names, and the agents were very interested and agreed to meet. But that's a far cry from saying that that's all they were ever going to ask him about. I didn't say that. I said Judge Tarnow found that Mr. Mislanka's subjective understanding of the beginning of cooperation was regarding three individuals. So Mr. Mislanka testified... Is that on another, maybe later part of the opinion? If I could grab my briefs. Well, that's all right. I'll look for it while you're talking. So Judge Tarnow found that Mr. Mislanka gave three names, and Mr. Mislanka's testimony at the evidentiary hearing was who he was under the understanding that he was supposed to be cooperating against. And he said that he had concerns about... He'd informed the government that he was concerned about cooperating against anybody else. The specific factual finding that I mentioned about Judge Tarnow was Judge Tarnow made a factual finding that the reason it fell apart at the grand jury was because the DEA agents started asking Mislanka about other people. And Mislanka had been under the impression that he did not have to cooperate against other people. Getting back to prejudice, how would it make any difference if counsel was there and said, Client, your subjective understanding is not consistent with what the U.S. attorney wants, and you think you only have to testify against these three individuals, but they insist that you testify against everybody else. Well, he still didn't want to do it. I mean, how would that make any difference here? Well, I think, first of all, we need to talk about what the burden is in terms of that. We don't have to be certain that it would have made a difference. We have to be certain. We have to have a reasonable probability that it would have made a difference. A reasonable probability that he would have testified? A reasonable probability that he would have testified before the grand jury. Well, at that point, you're saying that even though he refuses to testify against the family members and the friends, he thought he was still cooperating? Is that your argument? No. Well, no, not exactly. My argument is, first of all, let's back up just briefly, but I think some of the argument is that this could have been alleviated, frankly, not just if she had just shown up at the grand jury. The U.S. attorney wanted him to testify against all individuals, not just three. He subjectively, your argument is, thought that he was allowed to only do the three, but the U.S. attorney has something else, and the cooperation is within discretion of the U.S. attorney. He's not testifying against the other people, so I don't know what difference it would make if counsel were there, that's all. I think, first of all, the difference that it would make is that the testimony that he was going to give ultimately at the grand jury, based on what questions were asked during the prep session that he was testifying, that he was answering the questions accurately, was just going to be about the scope of the investigation that he had agreed to to date, that he had been cooperating with to date. What the questions that the DEA agents started asking about, which were different than what he had prepared for to date, took him by surprise. What the attorney could have done in that instance, she could have said to the DEA agents, look, that's separate from what he's going to testify about today. Can we hold off on asking him questions about that until he's testified, and then we can talk about those things? Because you're making him nervous. You're making him think he's going to have to testify about people in this grand jury session that you have not prepared him to testify about. And that's accurate. She could have also then taken her client aside and said, look, when you cooperate, you have to cooperate fully and completely. Now, frankly, I have to say that Sally Irwin did not even know this to be the case because she didn't know what he was cooperating about. She didn't know who he was cooperating against. She didn't know what he could or could not give them. So it's hard for her to have... You need to cooperate with them, and they will come our way. But frankly, it's really hard to see how that is competent advice when you have no idea whatsoever and you have no desire to find out whatsoever what your client is willing or capable of giving. And I think the agents and the United States Attorney really make a good point here that... Because even when clients cooperate fully, there are times when that cooperation does not rise to the level of substantial assistance. They could give everything they have, and it doesn't give them the benefit... They're not going to get the benefit of that outcome because it doesn't actually further the investigation. When you're counsel and you don't even find out what your client knows or can offer the U.S. Attorney's Office and find out if that's something that actually could help them further their investigation, it's hard to see how that can be competent advice where you just tell them to cooperate fully, and they will come our way. You're back on the deficient performance prong. We're looking at prejudice at least right now. So let's see if we can push this to its extreme and see where it goes. A normal cooperation agreement would be to cooperate not only with testifying before the grand jury, but then if there are indictments and there's a trial, you have to testify at the trial too, right? Correct. Is there any reason to believe that wasn't what they had in mind here? The problem is there's no common understanding of what people had in mind here. There's a subjective understanding. I understand that, but there's no mechanism by which any lawyer had any ability to get the DEA to put in writing what somebody who's not even a target of the investigation was going to come testify to. That's not actually accurate, at least according to the Assistant U.S. Attorney, who said if she had come to them asking for some sort of Castigar letter that they could have done that. And frankly, it's not even necessarily them. You're not suggesting that the agreement would have been just to testify before the grand jury, which may or may not result in an indictment, and then not follow up by testifying at trial? No, I'm not saying that. So you're assuming that that would have been the case, right? Right, but my point is, sorry. Before you get to your point. Sorry. I just want to get through the questions. So what you're basically saying then is that this lawyer would have had the duty to go with him in connection with these proffers and to counsel him right up to his testimony at the grand jury. Now, obviously she can't go with him into the grand jury room, right? Correct. And then if whoever he was testifying against got indicted, he then would have had a duty to show up and testify at trial. So she would have had to show up for all the prep sessions and each day that he was called to testify at trial to basically be sort of standby counsel in connection with the federal prosecution of somebody else arising out of the cooperation agreement in state court? No. When would her obligation as you see it have then stopped? Her obligation would have stopped, frankly, where all of these other courts have found that the obligation has stopped. Where the adversarial proceeding has stopped being an adversarial proceeding. And in those instances, it has been where there has been a meeting of the minds among the attorneys and the client so that everybody knows what is expected of the client. And so when you look at Wingo and Allen and all of these other cases that we cited in our brief, every court has said once there was a cooperation agreement, a plea agreement, a cooperation letter, anything where all the parties got together, laid out exactly what was required of the client so that the client is aware and the attorney is aware and everybody is aware of what the obligations and the limitations are. At that point, she has satisfied her duties pursuant to all of the cases that are out there. We never got to that point because nobody ever was on the same page in this case as to what those obligations were. And I see that my time is up. So unless there are further questions. There are not. Thank you, counsel. Thank you. Your Honor, just to respond to counsel's argument, starting with the prejudice prong here, counsel mentioned that there has to be a reasonable probability that Mr. Musnaka would have testified at the grand jury, but that's not quite the test here. It is a reasonable probability standard, but it's a reasonable probability  The outcome is that there would be a different outcome is which deal Mr. Musnaka would have taken. There is no reasonable probability that he would have even been offered the more favorable plea agreement because he failed to fully cooperate. And Ms. Laforte even mentioned that if the cooperating witness doesn't even have the amount or quality of information that the federal agents want, they can't be helpful. And if they can't be helpful, if Mr. Musnaka could not be helpful either because he refused or his information was bad, he was not going to get the benefit of that plea agreement with or without Ms. Irwin. And lastly, Your Honors, the point here is Mr. Musnaka knew what he had to do. In the moment, while he was cooperating, he knew what was required of him. He didn't raise this claim until a year and a half after he was sentencing his state prosecution. In fact, even at his state sentencing, he did not advocate for his own cooperation. He didn't tell the judge, but Your Honor, I cooperated. I should be getting a better deal. I should be getting less time. He didn't say anything along those lines. He used the same grounds that his attorney did, which was his history of substance abuse and why he committed that armed robbery. He did not even use his own cooperation as a bargaining tool in that point. And if he didn't use it, there's no reason to expect his counsel to do it and no reason to think that she would be constitutionally ineffective for failing to do that. Unless Your Honors have any questions, we ask that you reverse. We do not. Thank you, counsel. The case will be submitted. Clerk may call the next case.